# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. H-09-491 |
| | § | |
| DANIEL BRIONES | § | |

## MEMORANDUM AND ORDER

This criminal prosecution is before the Court on Defendant Daniel Briones's Motion to Suppress Evidence [Doc. # 20] ("Motion"), seeking to suppress all tangible evidence that Houston Police Department ("HPD") officers seized from Defendant's bedroom on May 28, 2009.  Defendant seeks also to suppress statements he made at the scene of the arrest and in the police station a few hours later in which he acknowledged that the weapons and other seized items were his.  The Government filed a Response [Doc. # 24] in opposition to the Motion.  The Court held a hearing on December 3, 2009, after which the Government filed a Supplemental Response [Doc. # 34].  Having carefully considered the parties' written submissions and oral argument, the evidence introduced at the hearing, and pertinent legal authority, the Court **denies** the Motion.

## I.     FACTS

The Government presented three witnesses, HPD Officer Bobby Jennings, HPD Sergeant Michael Perales, and HPD Officer Donald R. Spradlin. Defendant presented the testimony of his sister, Ana Marie Briones. The Court credits the testimony of the officers, to the extent they had a recollection of the events in issue. The Court credits some but not all of Ms. Briones's testimony.

The Court makes the following findings of fact.[1] Early in the morning on May 28, 2009, HPD officers assigned to the Northeast Warrant Squad were directed to execute a valid felony arrest warrant for Defendant, based on charges that Defendant had engaged in a burglary with intent to commit other felonies.[2] The officers were directed to look for Defendant at his home and were aware of his appearance.[3] The officers were aware that Defendant was affiliated with a gang, the Houstone Tango Blast.

Approximately seven officers went to Defendant's home at about 6:05 am. It was still dark, but the sun was coming up. The officers knocked loudly on the front

---

[1]  To the extent a finding of fact is more properly characterized as a conclusion of law, it should be deemed so. To the extent a conclusion of law is more properly characterized as a finding of fact, it should be so construed.

[2]  HPD Report [DX 1], p. 4.

[3]  The officers had been shown a photograph of Defendant.

door. Officer Jennings was at the front of the officers positioned at the door.[4] After a brief delay, he heard movement, more delay, and then a man who looked like Defendant opened the front door. The man inside did not unlock the burglar bars that covered that door opening. The man asked what was going on and Jennings explained they were there to execute the warrant for Defendant. When Defendant declined to let the officers in, Jennings stated they would pry the door and burglar bars open. Defendant then opened the burglar bars and stepped back about 10 feet. The officers grabbed Defendant and handcuffed him. Defendant, when asked, stated no one else was in the house.

Several of the other officers looked quickly around the house for other people, using flashlights. When they passed a closed door, they opened it and found Defendant's sister, Ana, and her five-year-old daughter sleeping in the bed. The officers woke them and took them to the front of the house. Defendant, Ana, and Ana's daughter were brought outside. Defendant was placed in a patrol car while still handcuffed. Defendant was dressed in his boxers and blue jean shorts.[5] He asked

---

[4] Half the officers were positioned at the back of the house. Sgt. Perales stood at the front corner of the residence so he could see the front door and notify those in back by radio what was happening.

[5] There is a factual dispute about whether Defendant had on both blue jean shorts and his boxers (which were a similar color blue). Both Jennings and Perales testified that they recalled he was in only boxers. However, Jennings wrote in the arrest report that
(continued...)

Jennings for a shirt and shoes, and stated they were in his room near his bed. Perales and Jennings asked Ana to show them Defendant's room, which she did. She went into the bedroom as the officers stood in the doorway. The officers saw clothing on or near the bed. When Ana turned the light on in Defendant's room to get his clothes, Jennings and Perales saw a silver pistol on top of the bureau, which was located on the right wall five or six feet inside the room.[6] The pistol was in plain view. The officers also saw a rifle leaning up against a wall in plain view. Finally, on the floor was a large black duffle bag, unzipped. Inside the duffle bag, and visible from a distance, was a large quantity of ammunition. An armored vest, referred to as a flack jacket, was found near the black duffle bag.[7]

The officers knew that Defendant was a convicted felon. They secured the pistol and rifle, and seized the guns, ammunition, armored vest, and duffle bag. The officers call the district attorney, who authorized charges for felon in possession of a

---

[5]   (...continued)
Defendant asked for a shirt and shoes and that the officers got him those two items, indicating that Defendant may have been wearing the blue jean shorts.

[6]   This is an estimate. Ana testified the house was small. From the house floor plan drawn by Ana Briones and introduced in evidence by Defendant (DX 3), the bureau was on the right wall near the doorway into the room. The closest side of the bureau was immediately beyond a closet door opening, which itself was only a couple of feet inside the room.

[7]   It is unclear if the vest was inside the duffle bag, partially exposed, or was outside but near the bag. The location of the vest is not material. The Court credits Sgt. Perales's testimony that he could see bullets and ammunition inside the bag from the doorway.

firearm. Thereafter, the officers checked the serial numbers of the weapons and learned the pistol was stolen.

Later, an HPD crime investigator came to the house to investigate the burglary charge. He photographed the seized items which the officers placed on the driveway for that purpose.[8]

Perales asked Defendant's sister if she knew about the weapons in the house. She stated she did not. While questioning her, Perales stated something to the effect that because there were loaded guns in the house, Child Protective Services ("CPS") could investigate. Defendant heard this exchange and volunteered that the weapons were his. The officers had not posed any questions to Defendant and had not given him any *Miranda* warnings.[9]

Defendant was taken to the Houston City Jail. About 15 minutes later, he was taken for further questioning by Sgt. Greg Shelton, who informed Defendant of his

---

[8] Defendant complains that the seized items were not photographed in the locations where they were found. The Court is unpersuaded that this was a necessary, or even a reasonable step. The officers, who were not crime investigators, were there to execute a warrant. They needed to check whether the guns they unexpectedly found were loaded. Indeed, they determined that the rifle was loaded with a magazine containing at least 30 live rounds. There was a young child living in the house and neither she nor her mother were under arrest or detained. For the safety of the family and the public, the guns needed to be taken into policy custody immediately.

[9] *Miranda v. Arizona*, 384 U.S. 436 (1966).

*Miranda* rights. Defendant then stated that he owned the vest. The evidence is unclear whether he admitted again at this point that the guns and ammunition were his.

There is no indication that any officer was abusive, loud, physical, or threatening with Defendant or his sister at any time. There is no evidence that Defendant asked that the questioning at the police station end or that he requested an attorney.

## II.   ANALYSIS

Defendant contends that the officers lacked a legal reason to enter his room, that the guns and ammunition were not in plain view when they entered and searched his room without authority, and that the statements he made were tainted by the unlawful search and should be suppressed as "fruits of the poisonous tree." Defendant further contends that neither he nor his sister consented to the officer's entry or search of his room, and his confessions were not voluntarily or freely given.

### A. **Entry into Defendant's Room**[10]

The Government contends that the officers lawfully entered Defendant's room to obtain a shirt and shoes for Defendant before they took him to jail. The Government relies on *United States v. Wilson*, 306 F.3d 231 (5th Cir. 2002),[11] in which the Fifth Circuit held that the need to get clothes for a suspect can constitute exigent circumstances permitting a warrantless entry into the suspect's home or room. In *Wilson*, the Fifth Circuit held that "the potential of a personal safety hazard to the arrestee places a duty on law enforcement officers to obtain appropriate clothing" and the officers faced exigent circumstances permitting the officers' entry into the suspect's apartment without a warrant to get clothing for the suspect. *Id.* at 241. The

---

[10] It is undisputed and unchallenged that the officers entered Defendant's home and the rooms in it to conduct a protective search for additional persons. Officers may enter a home to effect an arrest pursuant to a warrant. *Payton v. New York*, 445 U.S. 573, 602-03 (1980). Additionally, officers may conduct a cursory protective search to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could immediately be launched." *Maryland v. Buie*, 494 U.S. 325, 334 (1990). There is no dispute that the officers did not find any guns or contraband during the protective sweep of Defendant's home or his room. Thus, the legitimacy and the proper scope of the protective sweep are not an issue in this case.

[11] The holding in *Wilson* regarding protective sweeps was overruled by *United States v. Gould*, 364 F.3d 578, 586 (5th Cir. 2004) (*en banc*), but the holding regarding exigent circumstances being presented by the need to obtain shoes and clothing for the arrestee remains binding legal precedent in the Fifth Circuit. *See, e.g., United States v. Clay*, 408 F.3d 214, 218 (5th Cir. 2005) (discussing *Wilson* and holding that "the need to procure footwear for [the arrestee] constituted exigent circumstances justifying [the officer's] return to the bedroom").

court stated by way of further clarification that "the hazards of public sidewalks and streets pose a threat of injury to the feet and other exposed areas of the body." *Id.*

The Court finds dispositive the Fifth Circuit holding in *Wilson*, as reaffirmed by *United States v. Clay*, 408 F.3d 214 (5th Cir. 2005).[12] Indeed, the facts in *Wilson* and *Clay* were more favorable to the defendant than those presented here. Unlike Defendant in this case, neither Wilson nor Clay asked for additional clothes or shoes. In each of those cases, the law enforcement officer decided without input from the arrestee that additional clothing or shoes were needed. Here, to the contrary, Defendant himself believed that he was inadequately dressed, asked the officers to get a shirt and shoes for him to wear, and told them where they could find clothes and shoes he was requesting.

Cases from other circuits in which the courts held evidence should be suppressed in connection with obtaining clothing for the arrestee are factually distinguishable from the case at bar.[13] For example, in *United States v. Whitten*, 706

---

[12]   The Fifth Circuit's holding in *Wilson* and *Clay* is consistent with the decisions on the issue from other circuits. *See, e.g., United States v. Gwinn*, 219 F.3d 326 (4th Cir. 2000) (officers reentered trailer to get shirt and boots for arrestee); *United States v. Butler*, 980 F.2d 619 (10th Cir. 1992) (officers accompanied arrestee back inside trailer to get shoes); *United States v. Di Stefano*, 555 F.2d 1094 (2d Cir. 1977) (officer accompanied arrestee, who was wearing only a nightgown and bathrobe, to get dressed).

[13]   Defendant cited *United States v. McMullin*, 576 F.3d 810 (8th Cir. 2009), and *United*
(continued...)

F.2d 1000 (9th Cir. 1983), the officers took the arrestee into the hotel room *before* he requested additional clothing. In *United States v. Kinney*, 638 F.2d 941 (6th Cir. 1981), the Sixth Circuit noted specifically that the "defendant did not request permission to secure additional clothing."

Defendant also argues that the Supreme Court's recent decision in *Arizona v. Gant*, 129 S. Ct. 1710, 1719 (2009), that a search of a vehicle incident to a recent occupant's arrest is permissible only when the arrested person is unsecured and within reaching distance of the passenger compartment at the time of the search, is an indication of a new trend by the Supreme Court to limit the scope of reasonable searches in connection with arrests. *See* Motion, p. 2 (asserting that the Supreme Court intends to place "significant limits on the officers' ability to search once a person has been taken in to custody"). The Court is unpersuaded that the decision in *Gant* would cause the Fifth Circuit to alter the legal principles in *Wilson* and *Clay*.

---

<sup></sup>

13    (...continued)
*States v. McGough*, 412 F.3d 1232 (11th Cir. 2005). Neither case supports Defendant's argument here. *McGough* involved the "community caretaking exception" not relevant to the case before the Court. In *McMullin*, the court acknowledged the exigent circumstances situation where the arrestee is not wearing adequate clothing, but noted that the facts did not support the application of the exception in that case because McMullin was wearing shorts and sandals and the officer did not reenter McMullin's home to obtain additional clothing.

The Court concludes that the officers were authorized by exigent circumstances, specifically the need to obtain shoes and a shirt for Briones, to enter Defendant's home and bedroom.[14] Because they were lawfully in the room, they were entitled to seize the guns and other evidence that the Court finds was in plain view. *See, e.g., Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971); *United States v. Munoz*, 150 F.3d 401, 412 (5th Cir. 1998).

### B. Voluntariness of Defendant's Statements

*Miranda* warnings must be administered prior to "custodial interrogation." *See Miranda*, 384 U.S. at 444. "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id. Miranda* protections do not attach unless both the custody and interrogation prongs are satisfied.

#### 1. Defendant's Statement at his Home

The Fifth Amendment protects a defendant from self-incrimination and precludes the prosecution from using statements made during a "custodial interrogation" unless certain procedural safeguards are used. *Miranda v. Arizona,* 384

---

[14] Because the Court has determined that the law enforcement officers were lawfully in Defendant's bedroom to obtain shoes and a shirt for him to wear, the Court need not address whether he consented while he was handcuffed and seated in the patrol car. The Court also need not address whether Ana's agreement to accompany the officers to obtain the additional clothing constituted her consent to search Defendant's bedroom.

U.S. 436, 444 (1966). Voluntary statements, however, are not barred by the Fifth Amendment and do not implicate *Miranda* considerations. *See Rhode Island v. Innis,* 446 U.S. 291, 300 (1980). Indeed, "*Miranda* concerns are not triggered when officers merely take actions 'normally attendant to arrest and custody.'" *United States v. Brent*, 300 F. App'x 267, 271 (5th Cir. Nov. 17, 2008) (citing *Innis*, 446 U.S. at 301). Specifically, "[b]eing placed in hand-cuffs and held in a squad car cannot amount" to an interrogation for purposes of triggering the *Miranda* requirements. *Id*. at 272.

    In this case, the Court finds that Defendant stated that the guns and ammunition were his, and volunteered this admission without any questioning from the officers. The statements were not in response to any questions posed to him by the officers and, therefore, were not the result of an interrogation. Because there was no interrogation, there was no violation of Defendant's rights under the Fifth Amendment.

    To the extent Defendant argues that there was an interrogation because he was coerced by the statement made to his sister about a potential CPS investigation, the Court is unpersuaded. It is true that an "interrogation" for Miranda purposes includes "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. "*Miranda* protections are only violated when officers *should have known* their actions would produce an incriminating response." *Brent*, 300 F. App'x at 272.

In this case, there is no evidence that the comment regarding CPS was intended to be coercive, or that the officers expected or otherwise should have known that their statement to Ana would cause Defendant to blurt out that the guns and ammunition were his.

Because Defendant's statements at his house did not result from custodial interrogation or coercion that is the functional equivalent of a custodial interrogation, the statements were voluntary and the Motion to Suppress them is denied.

### 2.    Subsequent Questioning of Defendant at Police Station

Defendant was questioned after he reached the police station and after he was given *Miranda* warnings. "Once adequate [*Miranda*] warnings have been given, a suspect may knowingly and intelligently waive his *Miranda* rights and agree to answer questions." *U.S. v. Cardenas*, 410 F.3d 287, 292 (5th Cir. 2005).

Relying on *Wong Sun v. United States*, 371 U.S. 471 (1963), Defendant argues that his post-*Miranda* statements should nonetheless be suppressed as fruits of the Fourth Amendment violation. The Court disagrees. As discussed above, the officers were authorized to enter Defendant's house and bedroom by the existence of exigent circumstances, specifically the need – as recognized by Defendant – that he needed shoes and additional clothing. As a result, there was no violation of Defendant's

Fourth Amendment rights and the post-*Miranda* statements were not the fruits of an earlier violation.[15]

The original acknowledgment of ownership of the guns and vest was voluntary, and the later statements were made after Defendant was advised of his Miranda rights. As a result, Defendant's motion to suppress his confession is denied.

## III.  CONCLUSION AND ORDER

For the foregoing reasons, the Court concludes that the officers properly reentered Defendant's house and bedroom to obtain clothing and shoes for him, a need that Defendant himself acknowledged. Defendant volunteered, without questioning by the officers, that the guns, ammunition, and vest (which all were in plain view in his room) were his. Accordingly, it is hereby

**ORDERED** that Defendant's Motion to Suppress [Doc. # 20] is **DENIED**. It is further

**ORDERED** that the parties must appear for a pretrial conference on **January 19, 2010, at 9:00 a.m.** in Courtroom 9-F, United States Courthouse. Trial of this case will commence **Tuesday, January 26, 2010, at 10:30 a.m**.

---

[15]  The "fruit of the poisonous tree" doctrine does not apply to bar a post-*Miranda* statement even if made after a statement made without the *Miranda* safeguards. *See United States v. Jones*, 239 F.3d 716, 722 (5th Cir. 2001).

Signed at Houston, Texas, this **24th** day of **December, 2009**.

*[Signature: Nancy F. Atlas]*

Nancy F. Atlas
United States District Judge